UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| KEISHA A. JONES | | |
|---|---|---|
| Plaintiff, | | |
| - against - | | Index No. _____ |
| CITY OF NEW YORK | | |
| NYC COMPTROLLER | | |
| NYC DEPARTMENT OF SOCIAL SERVICES (DSS) | | |
| NYC DEPARTMENT OF HOUSING PRESERVATION AND DEVELOPMENT (HPD) | | **COMPLAINT** |
| URBAN PATHWAYS, INC. | | **JURY TRIAL REQUESTED** |
| HELP USA, INC | | |
| WESTHAB, INC. | | |
| INSTITUTE FOR COMMUNITY LIVING INC. (ICL) | | |
| TAMARA BRYANT in her professional capacity as Program Director at INSTITUTE FOR COMMUNITY LIVING INC. (ICL) | | |
| Defendants. | | |

Pro Se Plaintiff, Keisha A. Jones, brings this civil action against the defendants to enforce approved reasonable accommodations and to seek relief for unlawful actions and inactions resulting in the need to seek emergency shelter in June 2020 during the pandemic and civil unrest (curfew imposed) in NYC. Doing so has caused me tremendous, foreseeable and avoidable harm.

## SUMMARY

1. I am not an attorney but, I must proceed until I can find one. My health is fragile

2. The harm and fraud perpetrated against me began in 2016 by Defendant Urban Pathways/Olivieri Drop In Center, a non-profit organization in the NYC housing business and is also funded by the NYC Department of Social Services (DSS). I discovered the fraud when I received

documents in 2022 containing false information that I believe Defendant Urban Pathways fabricated about me in retaliation for complaining about the organization verbally and in writing in 2017.

3. ~~I was harmed by not-for-profit organizations/Defendants HELP USA, Westhab and ICL, Inc. (NYC shelter operators during the pandemic), as they all violated my rights by ignoring~~ approved reasonable accommodations, falsifying records, conducting illegal searches and seizures, invasion of privacy, among other things.

4. ~~During the pandemic Defendant NYC Department of Housing Preservation and~~ Development (HPD) intentionally and willfully discriminated and retaliated against me when I asked questions, inquired about a reasonable accommodation, the "lottery" process, "ambassadors" requiring personal information to obtain assistance, and the troublesome (housing lottery) technology and process to complete applications for housing through Housing Connect (Jan 2021-June 2021).

5. During the pandemic Defendant NYC Comptroller ignored my phone calls and subsequent complaint filed in late 2021 with the NYC Public Advocate regarding 50-h hearing vendors/law firms. The first 50-h hearing vendor (Law Firm #1) did not maintain an operational office phone in NYC, it intentionally and willfully denied my right to the required hearing by trying to spook me into taking a dangerous, experimental product in order to assert my right to be heard in Court. I was left to assume that they were referring to "covid 19 vaccines". By lying, intentionally violating my rights, ignoring written correspondence and attempting to impose an illegal mandate on me, per Law Firm #1's January 2022 letter, the 50-h hearing did not occur. All involved have caused me tremendous harm.

6. Further, another 50-h hearing vendor, Law Firm #2, also attempted to deny my 50-h hearing by ignoring requests for a reasonable accommodation to appear in person and canceling the first 2022 hearing date while I was on the phone attempting to confirm the date in advance, including the details of the reasonable accommodation requested in late 2021.

7. I filed at least one complaint with the NYC Public Advocate. I was bullied by staff at Law Firm #2 by phone ("we don't deal with Pro Se's", "we don't work for you").

8. The 50-h hearing took place in March 2022 but Law Firm #2 continued to violate my rights and retaliate by mailing the hearing transcript to an address that I did not provide. They had to ~~research/look it up online. This is evidenced by pages 9-10 of the transcript. Instead of promptly mailing the transcript to the address Law Firm #2 absolutely knew was my mailing address on file~~ with the NYC Comptroller's office and from my written correspondence regarding the reasonable accommodation, Law Firm #2 mailed it elsewhere to intentionally harm me.

~~9. In June 2022 the bullying by Law Firm #2 staff (Donna, Michelle) continued and I~~ quickly ended it when I was transferred to one of the attorneys to answer my pointed questions.

10. Upon information and belief, the NYC Comptroller's office is delaying the 50-h hearing on notices of claim I personally submitted in April 2022 regarding the contemptible disclosure of protected medical information by the NYC Department of Social Services (HRA employees) to a third party (tortuous interference) in writing and by phone.

11. HRA has consistently violated my rights with respect to a service provider that it issued emergency assistance (EA checks) to on my behalf. As such, HRA is the subject of a separate complaint with the human rights commission for violation of approved reasonable accommodations.

12. Notwithstanding, despite the steady decline of my overall health, I must proceed in order to protect myself against the defendants.

**PARTIES**

13. Plaintiff is an adult residing in New York City.

14. Defendant URBAN PATHWAYS, Inc. is a domestic not-for-profit corporation in New York that is responsible for a DSS/DHS funded operation in NYC for adults seeking housing.

15. Defendant HELP USA is a tax-exempt organization (EIN 13-3770118) that operates a women's intake/assessment shelter facility in NYC.

16. Defendant WESTHAB, Inc. is a domestic not-for-profit corporation in New York that operated an emergency shelter in NYC during the pandemic between May 2020 and September 2021.

17. Defendant INSTITUTE FOR COMMUNITY LIVING Inc. (ICL) is a domestic not-for-profit corporation in New York that operates an emergency shelter in NYC during the pandemic since late July 2021.

18. Defendant Tamara Bryant is the Program Director at the ICL hotel shelter site that Plaintiff was opened in July 2021.

19. Defendant City of New York is a municipality organized under the laws of New York.

20. Defendant New York City Comptroller is responsible for the audit of the city's agencies and oversees the investigation, resolution and settlement of claims filed against or on behalf of the City of New York.

21. Defendant NYC Department of Housing Preservation and Development (HPD) promotes the quality and affordability of the city's housing and enforces housing maintenance codes.

22. Defendant NYC Department of Social Services (DSS) is comprised of the administrative units of the Human Resources Administration (HRA) and Department of Homeless Services (DHS).

## JURISDICTION

23. This Court has jurisdiction over the claims under Section 1983 (deprivation of rights), other laws and the relief sought.

## FACTUAL ALLEGATIONS

24. In 2016 I could not afford my rent stabilized apartment due to illness and loss of wages (employment discrimination).

### Defendant Urban Pathways

25. In early December 2016 I met a person that recommended Defendant Urban Pathways to secure income-based housing. I met with an employee named "Tiffany" and explained that I needed an affordable, rent stabilized apartment, same as what I had prior to becoming deathly ill.

26. I was assured that Urban Pathways could assist with housing. After much discussion (including my professional background) Tiffany explained an option that would meet my immediate

need for rest; "drop in" centers. This was unfamiliar to me because I have never been undomiciled in my life. She explained the "drop in" center operated by Urban Pathways had a "respite" program that facilitated safe spaces to sleep overnight while working with a case manager to obtain housing.

27. Tiffany gave me a referral to their Olivieri Drop In Center and I met with a supervisor, an elder gentleman, at approximately 4pm for "intake" in early December 2016. When I reached the top of the steep stairs, the supervisor asked for ID then he gave me specific instructions – look into the camera (upper-left corner above stairs) and hand me your ID – which I thought that was strange.

28. Prior to completing the required paperwork, I asked for a copy of the mountain of documents and I was told "no". Stunned, I asked why and did not receive a response. The drop in center required documentation to be signed and refused to provide a complete copy of the same, upon request immediately following "intake".

29. Defendant Urban Pathways intentionally and willfully did not disclose that the drop-in center operation was funded by "DHS" (NYC Department of Homeless Services).

30. As a direct result of fraud, I unknowingly entered the dangerous NYC shelter system by asking Defendant Urban Pathways for help securing a rent stabilized apartment (same as the one I lived in previously). They use DHS systems to administer their operation.

31. Unbeknownst to me, adults were sleeping in chairs at the drop in center and the "respite" program was a sham which caused me great physical harm and enriched Urban Pathways.

32. After the fact, I learned that the Coalition for the Homeless is the court appointed monitor for DHS *but* the Coalition does not have any jurisdiction over drop in centers. No one does.

33. My ordeal included intense discussions and notes with and to the case manager (Ms. Flowers), the "respite coordinator" (Ms. Valencia) and on-site management as I demanded a respite bed assignment, a true copy of all documentation in my file and detailed information about the so called "housing application" that was not available to read in advance or sign upon completion.

34. I endured an unprecedented ER visit (February 2017), challenged a questionable inquisition ("psych eval") for "housing", encountered an unethical medical doctor (mobile health

van) that verbally disclosed my medical information in public, was stranded at a respite site (had to take the LIRR back to the drop in center), was lied to, antagonized and bullied by a DHS employee in the spring/summer of 2017 (Tamara Green) because I refused to go along with the housing scam.

35. I resisted being wrongfully thrown out of the respite site late at night (September 2017) but was denied respite (I was kicked out the next day but could continue to "drop in").

36. I delivered a written grievance to DHS in October 2017 to Ms. Lyndersay on the 20th floor at 33 Beaver Street, which mysteriously disappeared after I spoke to her by phone.

37. I was lied to, antagonized and bullied before, during and after a meeting that I demanded and took place weeks later in November 2017 at Urban Pathway's 8th Avenue office.

38. My in person ordeal with ended in late November 2017 after rejecting a written referral to a NYC shelter from the second case manager (Mr. Rubin who resigned soon after) and I left the Urban Pathways Olivieri Drop in Center never to return again after Mr. Rubin in 2017.

39. I filed a complaint with the NYC public advocate and it was clear that it was intentionally being ignored by DSS (retaliation).

40. Partial information demanded and received from Defendant ICL Inc. in 2022 indicates that Urban Pathways falsified records regarding my health and defamed me, among other things.

### Defendant HELP USA

41. In June 2020 I sought assistance from the disability office within the NYC Department of Social Services (DSS) as a direct result of the pandemic.

42. I was advised to submit a reasonable accommodation request (RAR) due to my pre-existing physical medical condition. The request was submitted and approved days prior to me walking into the women's intake/assessment shelter in NYC operated by Defendant HELP USA. My RAs were "in the system" but I was not accommodated or given printed copies.

43. During the "intake" process on 6/12/2020 qualified personnel was not available to answer my questions about the paperwork or process. "Failure to comply" or hesitation on my part to

complete the paperwork and questionnaires would have resulted in denial of service. I was told to "come back tomorrow" when I stated that I cannot climb stairs.

44. ~~HELP USA ignored the approved RAs subjecting me to emotional distress, health hazards including covid, among other things, in a congregate setting from 6/12/2022 to 6/18/2022.~~

45. When I asked for a complete and accurate copy of the "intake" documents, signed and unsigned, before the completion of the process I was denied. Instead, I was given a blue sheet of ~~(stiff) paper by staff and told I can write my complaint (demand for a copy) down and he will put it~~ in my file. I did so when he left the room and took a picture of my handwritten note.

46. I was in contact with my PCP almost daily and the DSS Office of Advocacy & Outreach (disability office), as my health was declining with each day. There was no food on-site for me to eat (dietary RA ignored) and I could not sleep in that filthy, over crowded space which doubled as a smoking lounge all day and night. I've never been arrested but I can say it was prison like.

47. After days of complaining, on June 17, 2020 I received some of the paperwork I completed on 6/12/2020 and discovered that someone forged my initials on a form that I questioned and refused to sign.

48. On Friday, June 19, 2020 I was wrongfully thrown out into the street by HELP USA employee "Ms. Simon" for questioning a transfer to an undisclosed location late at night. I was yelled at and told to sign a questionable, photocopied document.

49. Ms. Simon did not know where I was going (address) and did not know if it met the RA (private room with an attached private bathroom). Therefore, I declined the shelter assignment because I was afraid for my health and safety.

50. I notated the document to make it clear what happened, signed it and took my copy. Had I not done so Ms. Simon said she would "sign it". I do not have an accurate copy of the documents in my file maintained by HELP USA dated 6/12/2020. Fraud appears to be systemic.

51. After calling and speaking with legal resources, social workers and advocates, I reached the DSS disability office on Monday, June 22, 2020 and was given the name and address of

the temporary hotel shelter site operated by Defendant Westhab. But fore fierce advocacy work on my part and prayer, the ordeal would have lasted for weeks not days (6/12/2020 – 6/18/2020).

<u>Defendant Westhab</u>

~~52. On June 22, 2020, I was told that I needed to complete "intake" again, before being~~ assigned a room. Again, I asked for copies of both signed and unsigned forms beforehand and was denied upon arrival.

~~53. The building and room assignment was satisfactory, consistent with a well maintained~~ hotel for business and leisure travel, but it did not meet the needs provided for in other approved RAs (location, dietary needs, bed rest).

54. In the middle of the night, day one (6/23/2020) at approximately 1am I was startled when Westhab "security" unlocked my door, turned on the light and walked into my room. This was done despite signing the attendance roster at 10pm. When I complained, management and staff said they are required to conduct a headcount or "census" multiple times after the roster is signed. DSS ignored complaints and correspondence from my PCP.

55. When I arrived at the hotel site on 6/22/2020 I did not meet with anyone from the case management team. Days later I received a document (DHS Form 12A) with my sensitive, personal information exposed, false information and threatening language.

56. In part, DHS Form 12A falsely stated that a case manager met with me and "EXPLAINED TO THIS CLIENT THE CONSEQUENCES OF CONTINUED VIOLATIONS OF ILP AND CLIENT REESPONSIBILTY REEQUIREMENTS AND HAVE GIVEN THE CLIENT NOTICE WHICH STATES THAT CLIENT HAS A RIGHT TO AN AGENCY CONFERENCE OR FAIR HEARING TO CHALLENGE THE ILP VIOLATION."

57. DHS Form 12A also states, "failure to comply" could result in "discontinuance" of "temporary housing." Another threat to be wrongfully thrown out into the street.

58. DHS Form 12A is deficient, false, threatening and perhaps unlawful.

59. When receiving this form late at night (10pm), I was consistently asked to sign it to acknowledge receipt of the document, when in fact signing it indicates agreement and I raised the issue with the case manager 6/26/2020 and management to no avail.

60. The first case manager that I spoke to about the issues – arbitrary "wellness check", copies of my documents, lack of food, water, daily intrusions by "security" – and handed my written grievances to him in early July 2020, he resigned on or about 7/24/2020. During one conversation, he acknowledged that I was not the only one complaining about the same issues.

61. During an initial meeting with the onsite Westhab Program Director regarding my grievances, with an emphasis on "security", he indicated that I could be "transferred" to a "congregate shelter" because the daily searches and "wellness check" / intrusions by "security" will not stop because it's "DHS policy". Such a transfer would violate my RA, jeopardize my health and safety and he knew that. The intimidation tactics never ceased.

62. The intrusions caused verbal conflict in the middle of the night between midnight and 5:30am. The most egregious was on or about 8/16/2020 when a "supervisor" (Margie) quietly walked into my room (closed the door behind her) with a cell phone flashlight and stood near the bathroom like a thief in the night. A shouting match quickly ensued and she finally left as I was going to call NYPD. Another incident occurred when Westhab staff entered my room while I was in the bathroom and I literally had to jump out of the shower to stop staff from coming in. Another shouting match ensued.

63. The random "wellness check" practice is dangerous, an invasion of privacy, violates HIPPA and I believe other laws.

64. In the summer of 2021 I found a list in common areas of the building with room numbers, names, and medical information of women at the site. The Westhab program director (#3 Mrs. Brown) was not on-site for days when I attempted to give her the papers and address the issue.

65. As a direct result of the arbitrary "wellness check" practice, in 2020 I developed a sleep disorder and other symptoms and diagnoses, in addition to my pre-existing condition that still persist.

66. The onsite Westhab Director of Social Service #1 and other staff generated false documentation by printing DHS Form 12A without my knowledge or consent. She also mentioned during a meeting with the Program Director on or about 8/13/2020 that I could be transferred to a "transitional" living facility with a "psychiatric" diagnosis in order to have access to a cooking facility, to satisfy my dietary needs RA. That is not a reasonable accommodation under the ADA. This is the same tactic used by DHS employee Tamara Green (2017) when she tried to coerce me into the "supportive housing" scam. Preying on my desperate need for relief but they did not anticipate my unwavering faith in the Creator. I continued to complain verbally and in writing.

67. To add insult to injury another DHS employee verbally bullied and threatened to transfer me to an undisclosed location by 5 o'clock the same day he (Jorge) appeared at my room (608) in November 2020, with both Westhab directors.

68. In December 2020 I was forced to proceed with a suspicious process ("intake" again after the "intake on 6/22/2020 when I first arrived). I took copious notes following that traumatic encounter.

69. Upon information and belief the Westhab Director of Social Services, who held an MSW degree (Master of Social Work) and/or her staff, falsified records regarding my health because I was not given a copy of the requested documentation (generated "online" by the social worker after being verbally threatened by a DHS employee Jorge in November 2020) but I had to sign it. I did so after questioning and correcting the parts I could see of the multi page document.

70. Westhab was compensated for services not rendered; I did not have food to eat, there was no water on-site and they were budgeted for 3 "housing specialists" but there were 0-1 housing specialists on-site at any given time.

71. The nightmare at Westhab caused me to call NYPD for the first time in my life because of rogue Westhab male "security" staff (one yelled at me, one walked into my room without knocking, one cursed at me, 3 separate incidents). I did so to send a strong signal that I will defend

myself and pressing charges if necessary. DSS was made aware of numerous situations during this tumultuous time.

~~72. Between May 2021 and September 2021 there were numerous attempts to transfer me from Westhab (site closure September 2021) to undisclosed locations without notice or~~ documentation and in violation of my reasonable accommodations. I consistently maintained contact with DSS's disability office and my healthcare team to avoid a catastrophic medical emergency.

~~73. Between September 5 - 7, 2021 Westhab security staff knocked on my door one day~~ stating that I had to pack up and be ready to leave within hours without explanation and on another day Westhab employee (Ms. Hasan) forged a DHS document in an attempt to transfer me without notice to a location that violated my reasonable accommodation and my rights. I was so panicked I reached out to DSS, The Coalition For the Homeless and my healthcare team for help.

<u>Defendant NYC Department of Housing Preservation and Development (HPD)</u>

74. In December 2020 I was advised to apply for apartments using HPD's "Housing Connect" by the Westhab Director of Social Services. She stated that I would qualify because I am an in an emergency shelter. I could not do so by mail because of the lockdowns and lack of access to technology so I was forced to follow the online process to apply which was very challenging.

75. It was and remains my understanding that the process needed to be completed the same way it was started or else you're disqualified (apply by mail, all is done by mail, apply online, all is done online) which is why I would have applied by mail under normal circumstances.

76. Defendant HPD sent me an email in January 2021 that my lottery number was called with days to act. I immediately responded to the email with questions, I asked about a reasonable accommodation and continued to request help to complete the process by mail. My questions were not answered and when they did reply it was anonymous emails from HPD email addresses.

77. During the holiday weekend in February 2021 I received a one line email stating that my application was "rejected". No other information was provided.

78. I frantically sent more emails asking for help, also engaging DSS's disability office but they could not assist because HPD and DSS are separate agencies, despite the glaringly obvious need to coordinate. I spoke to someone from HPD that stated his role was not public facing like DSS (it was more of an EEO role for employees, not to help the public with HPD RA requests).

79. I demanded via email to speak to someone that could remedy the situation. I received another anonymous email from an HPD address in May 2021 asking for my phone number and I provided it. I waited for days and followed up asking who can I speak to and I did not receive a reply or a remedy. I did read a big newspaper article where an HPD employee was talking about housing connect, but nobody could help me and others similarly situated..

80. When I complained to the NYC Human Rights Commission a rep said they receive complaints all the time about HPD and the housing "lottery" but there's nothing they could do at the time I spoke to them in 2021 because my complaint did not fit precisely within their purview. I was subsequently locked out of the online Housing Connect portal despite not changing my password.

81. This has harmed me greatly by prolonging my time in the system. Instead of moving into a rent stabilized apartment in 2021, I was transferred again by DHS.

### Defendant ICL, Inc.

82. On or about September 7, 2021 I received written notice of a transfer to a location that did not meet my location RA but I was so distressed that I negotiated what I needed (no ride sharing, a specific time to leave, documents) to move on 9/9/2021. On this day I was forced into another "intake" process and denied copies of the documents again when I arrived to the second hotel shelter site for women operated by Defendant ICL Inc.

83. Defendant ICL Inc. violated my approved RAs also (dietary need, bed rest). The arbitrary "wellness check" practice continued, multiple times per day along with illegal searches (installed lockers, my groceries, etc.). I found myself yelling at approximately 1am when "staff" was banging on my door one night. I repeatedly yelled, what time is it? until they finally left my door.

84. There was a "community meeting" on or about 9/15/2021 with the directors and the "housing specialist" in the lobby area. I voiced my opposition to the "wellness check" to no avail.

85. On or about October 15, 2021 I scheduled a follow up meeting with the "housing specialist" Mr. Henry and the ICL Director of Social Services (Ms. Edgar) regarding housing and the lack of food and water. Neither was helpful. In fact, housing information was withheld (2021Q4) and I was given incorrect housing information (January 2022 – April 2022) by both directors and the housing specialist. Written complaints regarding discrimination (unemployed people are treated differently than employed; disabled vs. not disabled) fell on deaf ears.

86. The interactions with ICL Inc. management was unsatisfactory from the beginning and they proceeded to discriminate and retaliate against me by falsifying records in computer systems and paper files (dark 3 ring binder maintained and the same was done at the drop in center), denying my requests for housing information and scheduling meetings without asking for my availability so they can claim that I am being "non compliant" or missed a meeting.

87. Between February 2022 and March 2022 on-site ICL Inc. staff engaged in unethical behavior by pursuing me continuously for almost 30 days to complete a "psych eval" for "housing" after I clearly stated the first time (2/14/2022) that I did not apply for nor am I eligible for "supportive housing". This situation with the on-site social worker (LCSW) constantly knocking and ignoring what I clearly stated to him in plain English, reminded me of the experience with Defendant Urban Pathways (2016-2017) and Defendant Westhab (on-site MSW Director and social worker).

88. Now I was on high alert so I engaged ICL, Inc. staff like a boss by confirming a meeting in March 2022 with all relevant parties to witness my line of questioning and stated resolution according to my handwritten agenda. When I asked the "housing specialist" specifically if there was anything in the system that indicates a "psych eval" for housing he (Mr. Henry) stated "no". It's unclear if he's a liar or doesn't know how to navigate DHS systems.

89. The case manager witnessed and documented the meeting as I clearly stated directly to the LCSW to stop knocking on my door. Written documents should be in my file (handwritten, DHS Form 12A).

90. To add insult to injury, the LCSW subsequently was knocking on doors asking very sensitive personal questions in the hallway. Upon information and belief the answers to the 8 questions was a form of profiling and practicing medicine without a license. He stated that the program director Ms. Bryant instructed him to do so. Since he is a licensed clinical social worker he can "diagnose" but cannot prescribe. This occurred more than once and I clearly stated to the LCSW that I will not answer any questions and I left a firm, angry message with the newly promoted (from case manager supervisor) Director of Social Services Ms. Lee that I will file a complaint against the LCSW and he is to stay away from me. This reminded me of intense conversations at the drop in center (2017) with the on-site male nurse and the questionable female Nurse Practitioner that was diagnosing and prescribing psych meds. I refused to talk to her too except under strict conditions.

91. This was being done without informed consent, full disclosure as to the purpose, was an invasion of privacy (done in the hallway) and does not advance the ultimate goal, to move into affordable, rent stabilized (not supportive) housing. Rather it appears to be a scheme to move unemployed persons into "supportive housing" or housing that illegally requires diagnoses (i.e. a woman was having a lease prepared to move out of the shelter and was denied the apartment because she did not have a certain diagnosis, she was unaware of the disease "requirement" for "housing"). Providing such a significant amount of personal information without being given all of the "requirements" in advance, seems like a recipe for fraud. Identity theft specifically.

92. Shortly after the March 2022 meeting to get the social worker off my back, I discovered that ICL management and the housing specialist (Mr. Henry) continued to knowingly and willfully deny me access to housing information (project based section 8, HUD emergency housing voucher available in 2021).

93. Defendant ICL Inc. also unlawfully accessed, disclosed and submitted my personal information to third parties (mysterious "housing application") without my knowledge or consent. The same mysterious "housing application" that was pushed at the drop in center in 2017. They are also withholding an updated list of building owners they are compiling as women move out while posting an outdated, photocopied, suspicious list of buildings. Another recipe for fraud.

94. In April 2022 I submitted a grievance and demanded a meeting about this. The program director did not correct the situation. She refused to disclose exactly what was done with my personal information and withdraw fraudulent applications. This should be documented in DHS Form 12A and on file as I requested. The last time I met with the case manager was in April 2022. It is unclear if she was instructed by the program director Ms. Bryant to continue to generate false records (DHS Form 12A) after our last meeting.

95. In April 2022 I noticed that one of the clients was sitting at the front desk with security. After several encounters I spoke to the woman privately and asked why she was at the front desk with security, which presents a privacy issue for all clients when unauthorized individuals are privy to client information (sign in sheet at the desk, "wellness check" list, dietary needs if assigned to the "pantry" in room 205 etc).

96. Shockingly, she stated that the ICL Inc. program director Ms. Bryant asked her to "volunteer" or to participate in an "internship" by taking on a job that ICL Inc. is contracted to do in its capacity as a shelter operator (security, operations, food pantry in 205, etc.).

97. On or about May 25, 2022 the program director stated out loud in a "community meeting" in the lobby that the client (she called the person by name) was "helping out" and the intent was to keep the ladies "busy" during the day. She thanked the client at the meeting.

98. Days later I spoke to a case manager about this, asked who thinks this is a good idea and I did not see the client sitting at the front desk with security after that conversation with the case manager. It is unclear if she and other clients are being coerced in private, made promises, receiving preferential treatment, etc.

99. In July 2022 there was a fire at the ICL hotel shelter site with white smoke consuming one of the floors. It was frightening, traumatizing and avoidable (the program director Ms. Bryant ~~failed to supervise third party security protocols).~~

~~100. In August 2022 my healthcare provider facilitated a conference call with DSS's~~ disability office and we learned the "wellness check" should have been "suspended" long ago.

101. During that conference call we also learned about housing information that was not ~~provided by so called "housing specialists". I stated verbally and in writing, more than once, that~~ services were not rendered by the not-for-profits.

<u>Defendant NYC Department of Social Services (DSS)</u>

102. Asking for assistance during a time when I was deathly ill has caused more harm and no good has come of it. While the disability office within DSS was very helpful with as much as they could do, DSS is complicit and responsible for my suffering.

103. The DHS ombudsman is well aware of my complaints and said as much in an email to the public advocate's office regarding the missing October 2017 grievance. Rogue employees at HRA, DHS and suspect not-for-profits have gone out of their way to disrespect, intimidate and harm me. They did nothing to help me and everything possible to break me.

## CAUSES OF ACTION

**Violation of Constitutional, Civil and Human Rights, ADA Violations, Deliberate Indifference, Discrimination, Intentional and Negligent Infliction of Emotional Distress, Breach of Contract, Breach of Fiduciary Duty, Invasion of Privacy, Misrepresentation**

**(Plaintiff Against All Government Agency Defendants)**

104. Plaintiff realleges and incorporates by reference all allegations above.

## CAUSES OF ACTION

**Violation of Constitutional, Civil and Human Rights, ADA Violations, Fraud, Discrimination, Breach of Contract, Breach of Fiduciary Duty, Invasion of Privacy, Practicing Medicine Without A License, Falsification of Records, Libel/Defamation, Unjust Enrichment**

**(Plaintiff Against All Not-For-Profit/DHS Funded Defendants)**

105. Plaintiff realleges and incorporates by reference all allegations above.

## DAMAGES

106. Plaintiff is seeking monetary damages, including statutory, compensatory, punitive and all damages that may apply from all defendants and written apologies.

## PRAYER FOR RELIEF

Wherefore, Plaintiff prays for favorable judgment against Defendants as follows:

1. For a decision that "proof of vaccination" to proceed with a 50-h hearing is immoral, illegal and unconstitutional.

2. Temporary, preliminary and permanent injunctive relief restraining Defendants DSS and ICL Inc. from violating approved reasonable accommodations while in emergency shelter.

3. For a decision instructing Defendant DSS to fulfill RAs (fresh, unadulterated food, bed rest) and reinstate the location RA that was withdrawn (with help from the Coalition) out of fear of being retaliated against by DSS (DHS program analyst/administrator) and the ICL program director Ms. Bryant, with a surprise transfer to an infested, filthy (like "Cityview") shelter.

4. For a decision instructing Defendants DSS and HPD to provide assistance, information, appointments and follow through with qualified staff offline to secure rent stabilized housing that meets health and safety requirements.

5. For a decision instructing all Not-For-Profit Defendants to release all of Plaintiff's personal information, including but not limited to, hard copy emails, notes, files, documents, system printouts, paperwork etc, in a confidential way, as it pertains to Defendants DSS and HPD.

6. For reasonable attorneys' fees and costs if legal counsel is obtained; and

7. For any other relief the Court may deem equitable and just.

## DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial for all matters so triable.

Respectfully submitted,

_____
Keisha A. Jones
40 Ann Street
New York, NY 10038

Dated: August 23, 2022
        New York, New York

**DEFENDANTS**

City of New York
NYC Comptroller
One Centre Street
NY, NY 10007

NYC Department of Social Services
150 Greenwich Street
NY, NY 10007

NYC Department of Housing Preservation and Development
100 Gold Street
NY, NY 10038

Urban Pathways, Inc.
575 8th Avenue 16th Floor
New York, NY 10018

HELP USA
115 E. 13th Street
New York, NY 10003

Westhab Inc.
8 Bashford St.
Yonkers, NY 10701

Institute For Community Living, Inc.
6209 16th Avenue
Great Neck, NY 11024

FROM:
Keisha A. Jover
40 Ann Street
NY, NY 10038

USM 5P
SDNY

TO:
United States District Court
Southern District of NY
Attn: Pro Se Office
Delivered By Hand
8/23/2022

Photo Document Mailer
9 3/4" x 12 1/4"

Ready Post